UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BILLIE EDMONDS,                                    CIVIL NO. 16-3340 (DWF/DTS)

　　　　Plaintiff,

v.                                                 REPORT AND RECOMMENDATION
                                                              and
MINNEAPOLIS PUBLIC SCHOOLS,                        ORDER
*Special School District 1*

　　　　Defendant.

---

Billie Edmonds, P.O. Box 17370, St. Paul, MN 55117, *pro se* plaintiff

Jonathan P. Norrie, Esq., Bassford Remele, 100 South Fifth Street, Suite 1500, Minneapolis, MN 55402, on behalf of defendant

---

## INTRODUCTION

Billie Edmonds' employment as an Associate Educator/Behavior Dean was terminated during her 90-day probationary period.  Edmonds alleges that her termination was due to race discrimination and retaliation.  Minneapolis Public Schools states that it was due to poor performance.  Edmonds has not provided evidence from which a reasonable jury could conclude that the performance reasons given by the school district for her termination were a pretext and that the real reason was race discrimination or retaliation  Therefore, the Court grants the school district's motion for summary judgment.

## PROCEDURAL HISTORY

Billie Edmonds filed a complaint as a *pro se* plaintiff against Minneapolis Public

Schools, Special School District 1 ("MPS") and Martha Spriggs on October 3, 2016. Docket No. 1.  She alleged race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08; and reprisal in violation of the MHRA, Minn. Stat. § 363A.15.  *Id.* ¶¶ 24-32.  On October 7, 2016 the Court informed Edmonds of the Federal Bar Association, Minnesota Chapter ("FBA") *Pro Se* Project, which she could contact to request that a volunteer lawyer review her case.  Docket No. 3.  Edmonds filed an Amended Complaint against only MPS (not Spriggs) on December 5, 2016. Docket No. 8.

On December 14, 2016 the Court referred this case to the FBA's Early Settlement Conference Project ("ESCP").  Docket No. 10.  A day-long settlement conference with the Court was held on February 22, 2017, at which Edmonds was represented by ESCP counsel.  Civil Minutes, Docket No. 20.  The case did not settle, but a settlement offer to Edmonds remained open through February 27.  *Id.*  On February 28 the parties advised the Court that settlement discussions were continuing. Civil Minutes, Docket No. 21.  When the case did not settle, the Court removed it from the ESCP project and released the volunteer attorney from her responsibilities as Edmonds' counsel.  Docket No. 23.

MPS moved for summary judgment on September 8, 2017.  Docket No. 31. Edmonds did not file any response.  A hearing was held on October 31, 2017.  Civil Minutes, Docket No. 39.  Edmonds attended the hearing, argued in opposition to MPS's motion, and brought documents which the Court marked as Plaintiff's Exhibits 1 to 40. *Id.* The Court made copies of the marked exhibits and provided a set to each party after

the hearing ended.  *Id.*  MPS objected to the documents because Edmonds had failed to file any written response to MPS's summary judgment motion and because some of the documents contained protected non-public information, including students' names and disciplinary incidents, that cannot be disclosed in the public record.  Accordingly, the Court stated that they would not be made part of the public file.  *See id.*  The Court also granted MPS permission to file a supplemental brief to address Edmonds' arguments and documents she brought to the hearing and ordered MPS to file the errata sheet from Edmonds' deposition transcript.  *Id.*

On November 1, 2017, without permission from the Court, Edmonds filed an untimely declaration opposing MPS's summary judgment motion.   Docket No. 40. Edmonds characterized the document as a recitation of what she had stated at the hearing. *See id.* ("Here is what was spoken out loud at the hearing, October 31, 201[7] at 9:30 AM – 10:30 when plaintiff was reading from documents.")  Edmonds attached to her declaration 48 pages of exhibits that included protected non-public information about students.   Docket No. 40-1.   It appears these exhibits include some of the documents that the Court marked as Plaintiff's Exhibits at the October 31, 2017 hearing; however, they do not show any numbered exhibit stickers that the Court affixed to documents at the hearing.  *See id.*  Moreover, the handwritten exhibit numbers on the documents in Docket No. 40-1 do not correspond to the Plaintiff's Exhibit numbers from the hearing.   On November 3, 2017, after MPS's counsel alerted the Court that Edmonds had filed documents containing confidential student information, the Court restricted access so that only the parties and the Court are able to see the declaration and attachments.  *See* docket entry notation, Docket Nos. 40, 40-1.

3

As set forth in the Order below, the Court is ordering that the declaration and documents in Docket Nos. 40 and 40-1 remain sealed because they include protected non-public information about students, in particular, information relating to student conduct and discipline. Most of the information in Docket Nos. 40 and 40-1 does not fall in that protected category and the documents could have been filed in redacted form or been the subject of a motion to seal; however, that is not how these materials were filed with the Court. Therefore, the Court will order that Docket Nos. 40 and 40-1 remain sealed and available only to the parties in this litigation.

On November 10, 2017 MPS filed its Reply Memorandum, Supplemental Declaration, and the 22-page errata sheet for Edmonds' deposition transcript. Docket Nos. 41-43.

## FINDINGS OF FACT

In approximately May-June 2015 Edmonds, an African-American woman, was working in a short-term education support position at Lake Nokomis Community School - Keewaydin Campus when its then-Principal Martha Spriggs encouraged her to apply for an open position as Behavior Dean/Associate Educator. Amended Complaint ¶ 5, Docket No. 8; Deposition of Billie Edmonds (July 28, 2017) Tr. 57-58, 75, Aba-Onu Decl. Ex. 1, Docket No. 35-1.

Spriggs interviewed Edmonds and hired her on August 12, 2015, with a start date of August 17. Spriggs Decl. ¶ 2, Docket No. 34; Aba-Onu Decl. Ex. 3 (offer letter), Docket No. 35-1. Edmonds signed the job offer letter, accepting the Behavior Dean job, on August 12, 2015. Aba-Onu Decl. Ex. 3, Docket No. 35-1. The following language appears above her signature:

The probationary period of employment is specified in the bargaining unit agreement.  A probationary employee may be released without cause during the probationary period.  A probationary release for misconduct can result in barring you from future employment with the Minneapolis Public Schools.

Your rights as an employee are described in the bargaining unit agreement for the position into which you are being placed.  This position is represented by: <u>ESP</u>.

I, the undersigned, accept the offer of employment as described above.

*Id.* At the time she was hired, Edmonds understood that she was a probationary hire.

Edmonds Dep. Tr. 83-86, Aba-Onu Decl. Ex. 1, Docket No. 35-1.

Edmonds and Charleine Williams, an African-American woman, were the only two Behavior Deans during the time period that Edmonds held the position.  *Id.* at 76-78; Edmonds Decl. ¶ 7, Docket No. 40.

On October 1, 2015 Spriggs emailed an Employee Relations staff member stating her decision to terminate Edmonds' employment and her reasons for doing so:

Not following up with parents when she promised to do so.  Example: a third grade student was physically harmed on the playground one morning.  The student reported to his dad and the dad came to school and talked to Billie about it.  Billie said she would investigate and get back to dad.  She did nothing.  The student was harmed again by the same student.

Does not follow our agreed upon behavior protocol.  When a student is sent out they must go with a pass and if they get no pass she is supposed to bring the student back to the teacher for a pass.  She has not done this. She is also supposed to problem solve with the student and return with them to class. She has not done this.

Has not called parents when there are serious behavior concerns at school.  Parents have reported that they 'received no call.'

Seems confused about her role and does not follow expectations.  I have discussed her role at length.  See attached expectations I shared with her. She does very little of the tasks outlined on this.

Poor email communication with me and teachers.

Does not resolve behavior issues – she brings the issue to me prior to doing any investigation or problem solving.  "These two kids were sent out."  Then looks at me.

Spriggs Decl. Ex. 1, Docket No. 34-1.

MPS terminated Edmonds' employment on October 2, 2015.  Aba-Onu Decl. Ex. 6 (letter confirming probationary release from employment), Docket No. 35-1.  The termination letter to Edmonds stated that she was being released from employment during her probationary period "due to [her] failure to follow up with and call back parents, failure to follow the behavior protocol, and failure to successfully perform duties."  *Id.*

## CONCLUSIONS OF LAW

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  "In assessing whether such a dispute exists, we view the evidence in the light most favorable to [the plaintiff] and afford [her] all reasonable inferences."  *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115 (8th Cir. 2018).  There must be "enough evidence to allow a rational trier of fact to find for [the non-moving party] on the required elements of [the] claims."  *Id.*

"[T]o survive a motion for summary judgment on a discrimination claim, a plaintiff must either present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

L.Ed.2d 668 (1973)." *Id.*; *see also Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 818 (8th Cir. 2017) (same for reprisal claim). The same analytical framework applies to both MHRA and Title VII claims. *Liles*, 851 F.3d at 818, 821.

Edmonds has not alleged any direct evidence of discrimination or reprisal. "Direct" evidence demonstrates on its face that the employment decision was reached for discriminatory or retaliatory reasons. It "must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1046-47 (8th Cir. 2011) (en banc) (citing *Simmons v. New Pub. Sch. Dist. No. Eight*, 251 F.3d 1210, 1213-14 (8th Cir. 2001) (school board president's statements that "a woman can't handle [the administrator's] job" and that the employee was "a woman in a man's job" are direct evidence) and *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1318, 1324 (8th Cir. 1994) (supervisor's comment that "women in sales were the worst thing that had happened to this company" is direct evidence)); *see also EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 922, 923-24 (11th Cir. 1990) (general manager's statement that "if it was his company, he wouldn't hire any black people" is direct evidence).

Here, the record shows that Principal Spriggs was the decisionmaker who terminated Edmonds' employment during her probationary period. Edmonds has not alleged that Spriggs made any oral or written statement demonstrating that race or reprisal motivated her decision, nor has Edmonds presented any other direct evidence. Therefore, the Court applies the *McDonnell Douglas* burden-shifting analysis to her claims.

Under *McDonnell Douglas*, Edmonds must first establish a prima facie case of discrimination or reprisal. *Liles*, 851 F.3d at 818, 821. If she does so, the burden then shifts to MPS to articulate a legitimate, non-discriminatory and non-retaliatory reason for terminating her employment. *Id.* The ultimate burden then shifts back to Edmonds to produce evidence sufficient to create a genuine issue of material fact regarding whether MPS's stated reasons were a pretext for intentional race-based discrimination or reprisal. *Id.*

**1.    <u>Edmonds' Untimely Declaration and Exhibits, and Inadmissible Evidence</u>**

MPS filed its summary judgment motion on September 8, 2017 and Edmonds was required to file her response within 21 days. *See* District of Minnesota Local Rule 7.1(c)(2) (non-moving party must file memorandum of law, plus any affidavits and exhibits, within 21 days). She filed no response, offered no explanation or good cause to excuse her failure to do so, and did not move for an extension of time. Edmonds made an oral argument at the October 31 hearing, brought documents to the hearing, and filed a post-hearing declaration and exhibits on November 1, as discussed above.

Edmonds' failure to submit any legal memorandum or analysis, timely or otherwise, makes it difficult to sort out her arguments as the Court analyzes the legal sufficiency of her case. Her post-hearing declaration and documents merit exclusion from the summary judgment record due to their untimeliness and her failure to follow the Local Rules. Nonetheless, the Court will include them, in part, in the summary judgment record, partly in order for the Court to better explain the basis for its disposition of this case, subject to three important limitations. First, the Court must disregard Edmonds' statements and documents that are not based on personal

knowledge and are not admissible evidence.[1]  "A[] . . . declaration used to . . . oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Hearsay evidence cannot be used to defeat a summary judgment motion.  *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).

Second, the Court will not consider any statements in Edmonds' declaration that contradict her deposition testimony.  Generally, a court should consider a declaration submitted in response to a summary judgment motion when it "elaborates upon or clarifies information already submitted."  *Cole v. Homier Distributing Co., Inc.*, 599 F.3d 856, 867 (8th Cir. 2010).  "However, a party cannot avoid summary judgment by contradicting previous sworn testimony."  *Id.*

Third, the Court excludes from the summary judgment record the documents that Edmonds failed to produce during discovery, specifically, exhibits 16, 27-30, 34-37, 39-40[2] filed in Docket No. 40-1.  *See* Aba-Onu Decl. ¶¶ 3-4 (identifying documents not produced during discovery), Docket No. 42.  A party who fails to disclose or supplement required discovery "is not allowed to use that information or witness to supply evidence

---

[1]  Edmonds' declaration contains 69 numbered paragraphs.  Paragraphs 1 through 4 relate to the time period before she became Behavior Dean.  Paragraphs 31 through 69 simply identify the documents she filed as exhibits in Docket No. 40-1.  The remaining 26 paragraphs contain a variety of statements, some of which repeat evidence already in the record (for example, that Spriggs encouraged her to apply for the Behavior Dean position (¶ 5) and that she and Williams were the two Behavior Deans (¶ 7)), and many of which include general, conclusory statements unsupported by specific facts; inadmissible hearsay regarding what (often unnamed) students, teachers or staff allegedly said; or other statements not based on personal knowledge.
[2]  There is no Exhibit 38 marked on any document in Docket No. 40-1, nor is any Exhibit 38 listed among the exhibits identified by Edmonds.  *See* Edmonds' Decl. ¶¶ 31-69, Docket No. 40.

on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

At her July 28, 2017 deposition, Edmonds testified that she may have some additional documents that she did not previously produce to MPS and that she would check her records and produce any additional documents by July 31, 2017. Edmonds Dep. Tr. 225-29, Aba-Onu Supp. Decl. Ex.7, Docket No. 42-1. However, Edmonds did not provide any additional documents until after the October 31 summary judgment hearing, and she offered no reason or good cause for her months-long delay. Her failure to produce the documents before discovery closed deprived MPS of the opportunity to depose her about them and to address those documents when preparing its summary judgment motion and legal memorandum. Although the Court gave MPS an opportunity to file a reply memorandum to address Edmonds' untimely documents, that is not a substitute for a party's ability to investigate facts and develop legal defenses during discovery. Accordingly, the Court will exclude those documents from the summary judgment record.

## 2.    Race Discrimination

To establish a prima facie case of race discrimination, Edmonds must show that (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) there is evidence that gives rise to an inference of discrimination. *Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 913 (8th Cir. 2006). The fourth element can be satisfied by evidence that a "similarly situated" employee outside the protected class was treated differently. *Id.*

Edmonds has not presented evidence of any similarly situated employee who was not African-American who was treated differently.  A similarly situated employee is one who is not a member of the protected group and who "dealt with the same supervisor, [was] subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Gilmore v. AT&T*, 319 F.3d 1042, 1046 (8th Cir. 2003).  As Edmonds testified at her deposition, the only other Behavior Dean was, like Edmonds, an African-American woman, Charleine Williams.  Edmonds Dep. Tr. 76-78, Aba-Onu Decl. Ex. 1, Docket No. 35-1.

Although Edmonds testified that "ten to twenty" employees performed similar behavioral disciplinary duties as Williams and herself, she was unable to recall any names.  *Id.* at 107-08.  She also testified that "Caucasian employees" were given training and computer access that was denied to her, but she was unable to provide any specifics.  *Id.* at 264-66.  In her post-hearing declaration, Edmonds makes allegations about actions or inaction by "Caucasian teachers" and asserts that she was treated differently.  Edmonds Decl. ¶¶ 13-14, 27, Docket No. 40.  However, despite her belief that teachers are "support staff" who may have had some duties in common with her in her position as Behavior Dean [Edmonds Dep. Tr. 106, Aba-Onu Decl. Ex. 1, Docket No. 35-1], Edmonds has not established that she is similarly situated to a teacher. *See LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 694 (8th Cir. 2001) (person in a different department with a different position was not "similarly situated" in all relevant respects).  On its face, "teacher" is a different job than "Behavior Dean."  Moreover, Edmonds did not state any specific facts or present any admissible evidence to show

that any teacher's alleged actions or inaction occurred under comparable circumstances.

The burden of establishing a prima facie case is not onerous. *Torgerson*, 643 F.3d at 1017. However, Edmonds has not identified any "similarly situated" employee who was treated differently, and she has not presented any facts that support an inference of race discrimination. Therefore, she has not met her burden, and summary judgment is warranted on this basis.

Even if Edmonds had established a prima facie case of race discrimination, MPS provided legitimate, non-discriminatory reasons for terminating her employment, namely, poor job performance during her probationary period. *See* Spriggs Decl. Ex. 1 (Oct. 1, 2015 email stating termination decision and reasons), Docket No. 34-1; Aba-Onu Decl. Ex. 6 (Oct. 2, 2015 letter confirming probationary release from employment), Docket No. 35-1. This satisfies MPS's burden under *McDonnell Douglas.* *See Torgerson*, 643 F.3d at 1047 (employer's burden to articulate a non-discriminatory reason is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence); *Hannoon v. Fawn Engineering Corp.*, 324 F.3d 1041, 1047 (8th Cir. 2003) (employer easily met its burden by citing poor performance as the reason for termination). The ultimate burden then shifts back to Edmonds to produce evidence sufficient to create a genuine fact issue regarding whether MPS's stated reasons were a pretext for intentional race-based discrimination. *See Liles*, 851 F.3d at 821. She has not done so.

An employee may establish pretext by showing that discriminatory animus more likely motivated the employer's decision than the employer's stated reason, or by

showing that the employer's preferred reason for termination is unworthy of credence because it has no basis in fact.   *See Rooney,* 878 F.3d at 1117. Regardless of the method used, the employee must show that "a prohibited reason, rather than the employer's stated reason, actually motivated the termination."   *Id.*   "The evidence must do more than raise doubts about the wisdom and fairness of the employer's opinions and actions – it must create a real issue as to the genuineness of the employer's perceptions and beliefs."   *Id.* at 1118.   "[I]t is important to remember . . . that a federal court is not a super-personnel department with authority to review the wisdom or fairness of business judgments made by employers."   *Id.*

Edmonds testified that being African-American is evidence of pretext.  Edmonds Dep. Tr. 269, Aba-Onu Decl. Ex. 1, Docket No. 35-1.  Her race alone, however, does not establish pretext.   Moreover, it was the same decisionmaker (Spriggs) who encouraged her to apply for the Behavior Dean position, hired her, and then terminated her approximately seven weeks later during her probationary period.  When the same person hires and terminates an employee within a short period of time, there is a strong inference that discrimination was not a determining factor in the decision.   *See Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir. 1996).  There is nothing in the record to indicate that during this short time frame Spriggs developed racial animus that motivated her to terminate Edmonds' employment.

Edmonds also contends that she was denied training and computer access and that Spriggs reneged on an agreement for her to attend a Restorative Practices training seminar.  Amended Complaint ¶¶ 7, 21, Docket No. 8; Edmonds Decl. ¶ 16, Docket No. 40.  However, the record shows that Spriggs promptly approved computer access for

Edmonds, and the delays in implementing that access involved the IT department, not Spriggs. Edmonds' September 2, 2015 email to the IT help desk states that she "put in the request [for computer access] a week ago. Ms. Spriggs approved it." Aba-Onu Decl. Ex. 4, Docket No. 35-1; *see also* Edmonds Dep. Tr. 142-44, Aba-Onu Decl. Ex. 1, Ex. 4 (Sept. 22, 2015 email to IT: "I have access to Discovery. I do not have access to Classroom For Success."), Docket No. 35-1.

The record also shows that Spriggs immediately approved her attendance at the 4-day Restorative Practices seminar and that the person who raised a concern regarding Edmonds' attendance was the other Behavior Dean, who was concerned about coverage in Edmonds' absence. Edmonds' September 9, 2015 11:41 AM email to Spriggs and Williams states, "Hi, Martha, We decided that I will attend the event. . . . Sept. 28 – Oct. 1." Aba-Onu Decl. Ex. 5, Docket No. 35-1. At 1:00 PM that same day Spriggs sent an email to "[p]lease register Billie for this class and please use Qcomp funds for AEs to pay." *Id.*; *see also* Edmonds Dep. Tr. 137-38, Aba-Onu Decl. Ex. 1, Docket No. 35-1. Behavior Dean Williams raised her concerns a couple of weeks later. A document provided by Edmonds shows a September 22, 2015 email from Williams stating that "Bill[ie] is going to be gone next week at circle training and I am concerned about coverage" and that "elementary and middle school need full support." Ex. 19, Docket No. 40-1.

Edmonds testified that she received training and documents from Spriggs, Williams and Robin Francis regarding the Discovery program, Google Documents, and how to process student behavior reports, i.e., how to put data into the computer to provide the school with information on students' behavioral incidents and investigations.

*See* Edmonds Dep. Tr. 79, 81-82, 108, 110-112, 122-23, 130, 135-36, Aba-Onu Decl. Ex. 1, Docket No. 35-1. She received behavioral standards training from Francis, and she discussed behaviors, interventions and responses with Francis and Williams. *Id.* at 130, 133. She was given a chart regarding behavior levels, interventions and responses needed as a Behavior Dean, and an example of an investigatory report. *Id.* at 132-33. Spriggs gave her literature on restorative justice approaches, which Edmonds read and discussed with Spriggs. *Id.* at 131-32. Edmonds had an opportunity to talk with Spriggs, Williams and Francis about any questions or issues regarding the training and documents, and did in fact do so. *Id.* at 117-18, 130-31, 135-36, 144-45. She testified that Spriggs and Williams provided her with solutions on how to deal with issues relating to her job duties. *Id.* at 117-18, 135-36. The record does not support an inference of race-based discrimination related to training or computer access.

Edmonds offers no response to a specific example given by Spriggs, namely, an incident involving a third grade student who was twice harmed on the playground. Spriggs stated that Edmonds did not investigate or follow up with the student's father. *See* Spriggs Decl. Ex. 1, Docket No. 34-1. Edmonds does not address this example; rather, she makes general assertions that she contacted parents while performing her job. However, just because she may have contacted some parents does not mean she contacted parents in all instances or, specifically, in the instances that were reported to Spriggs.

Edmonds contends that Spriggs or "other staff" "could have" altered the Google Documents on which student behavioral incidents and data were recorded. *See* Edmonds Decl. ¶¶ 20-22, Docket No. 40. For example, Edmonds states that "Spriggs

edited the Google doc on September 22, 2015. *(Exhibit 27)*." *Id.* ¶ 22. However, there are two problems with Edmonds' reliance on the document she labeled as Exhibit 27. First, as discussed above, the Court has excluded the document from the summary judgment record due to Edmonds' failure to produce it to MPS during discovery. Second, on its face, it does not support any suggestion that Spriggs altered any information that Edmonds had input; rather, the document is a September 22, 2015 email from Spriggs to Edmonds and Williams that states, "I've made a change to the behavior log on Google docs. I've added a column to indicate a call home. Please be sure to make a call . . . ." *See* Ex. 27, Docket No. 40-1. It is pure speculation by Edmonds, unsupported by any specific facts based on personal knowledge, to allege that Spriggs or other staff "could have" altered data in some way that might be relevant to her claims.

More fundamentally, there is no evidence that the tracking data played any role in Spriggs' termination decision. Edmonds alleges that Spriggs "could not evaluate my performance on tracking data in Discovery . . . because I was not giv[en] [computer] access" until late September. *See* Edmonds Decl. ¶ 19, Docket No. 40. However, there is no evidence that Spriggs based her conclusions about Edmonds' performance on a review of tracking documentation. Rather, Spriggs' declaration and her October 1, 2015 email to Employee Relations staff indicate that she relied on reports from parents and on her own observations and interactions with Edmonds to conclude that Edmonds was not meeting performance expectations as Behavior Dean. *See* Spriggs Decl. ¶ 5 ("Despite our meetings and discussions, Ms. Edmonds continued to underperform and she demonstrated that she did not have any awareness of what her job responsibilities

16

were and how far away she actually was from performing them competently."), Ex. 1

("Parents have reported that they 'received no call.'"; "Seems confused about her role";

"Poor email communication with me"; "Does not resolve behavior issues – she brings

the issue to me prior to doing any investigation or problem solving.  'These two kids

were sent out.' Then looks at me."), Docket No. 34-1.

Spriggs stated that "[a]t the onset of her employment, I had concerns with Ms.

Edmonds's inability to carry out her job duties" and that she "continued to

underperform."  Spriggs Decl. ¶¶ 4-5, Docket No. 34.  Although Edmonds believes and

asserts that she was performing well, she presents no evidence that Spriggs' concerns

and opinions about Edmonds' performance were not sincerely held.  When evaluating

whether MPS's stated reason has a "basis in fact," the "critical inquiry" is not whether

Edmonds was actually performing well enough to retain her job during her probationary

period, but rather "whether the employer in good faith believed" that her performance

was deficient.  *See Liles*, 851 F.3d at 821.  To prove that MPS's "explanation was false,"

Edmonds needs to show that MPS, and specifically Spriggs, "did not actually believe

that her performance was deficient."  *See id.* at 822 (plaintiff "points to no evidence

indicating that [employer's] belief that she was not adequately performing her duties

was insincere").  The evidence presented by Edmonds has not "create[d] a real issue as

to the genuineness of [her] employer's perceptions and beliefs," and the record does not

support the conclusion that Spriggs' true motivation was race discrimination.  *See*

*Rooney*, 878 F.3d at 1118.

Even if Edmonds had established a prima facie case of race discrimination, she

has not presented evidence from which a reasonable jury could conclude that her

termination as Behavior Dean during her probationary period was a pretext for race discrimination. She has not shown that "discriminatory animus" motivated MPS's termination decision, nor has she shown that MPS's reasons are "unworthy of credence because [they have] no basis in fact." *See Rooney*, 878 F.3d at 1117. Therefore, MPS is entitled to summary judgment on Edmonds' claim of race discrimination.

**3.    Reprisal**

To establish a prima facie case of reprisal under the MHRA, Edmonds must show that (1) she engaged in statutorily-protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two. *Liles*, 851 F.3d at 818; *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101-02 (Minn. 1999) (same, stating that Minnesota courts apply *McDonnell Douglas* test to MHRA reprisal claims).

The Court assumes, without deciding, that Edmonds has established a prima facie case and proceeds to the analysis of pretext. *See Hannoon,* 324 F.3d at 1046 ("it remains permissible for lower courts to bypass analysis of the prima facie case where the facts permit easy disposition under a later stage of the *McDonnell Douglas* test"). In a reprisal claim an employee may demonstrate pretext by showing that a retaliatory reason "more likely than not" motivated the employer or by showing that the employer's "explanation is unworthy of credence." *Benassi v. Back & Neck Pain Clinic, Inc.*, 629 N.W.2d 475, 482-83 (Minn. Ct. App. 2001); *Sigurdson v. Isanti County*, 386 N.W.2d 715, 720 (Minn. 1986). Edmonds has not carried her legal burden to present sufficient evidence from which a jury could conclude that Spriggs was motivated by retaliation. Edmonds alleges she was terminated in retaliation for "reporting racially based

disparate treatment of students."   Amended Complaint ¶¶ 11, 21, Docket No. 8.   To support her claim of pretext, Edmonds testified that her Behavior Dean job gave her the authority to document and report students' complaints of unfair treatment due to their race, and that "teachers [may be] feeling that their jobs would be threatened."   Edmonds Dep. Tr. 268-74, Aba-Onu Supp. Decl. Ex. 7, Docket No. 42-1.   She testified that she made verbal reports to Spriggs and attended meetings with Spriggs, Williams, and a counselor at which they would discuss "how African-American students were complaining about the treatment of them from teachers and how they felt that they w[ere] being treated harshly."   *Id.* at 266-68, 276-77.   Edmonds testified that "[w]e discussed that on numerous occasions because we've had to report the color of our student[s] in Google Docs which gave [Spriggs] identification of who the students were." *Id.* at 267.   Edmonds stated that she was required to identify a student's race/ethnicity when documenting a complaint or behavior incident and that data was collected "to make sure that students were not being discriminated against."   *Id.* at 269-70; Edmonds Decl. ¶ 22, Docket No. 40.

Edmonds offers no connection between her performance of this aspect of her job and any retaliatory motive by Spriggs.   The subject was discussed in meetings with other school employees, including the other Behavior Dean, and documented in the school's behavior log.   Although Edmonds suggests that one or more teachers may have retaliatory animus towards her – for example, her testimony that "teachers [may be] feeling that their jobs would be threatened" – she also testified that some teachers told her she was doing a good job.   *See* Edmonds Dep. Tr. 145, 266, 269, Aba-Onu

Decl. Ex. 1, Docket No. 35-1.[3]   Moreover, it was Principal Spriggs who hired, supervised, and terminated her, not the teachers. The record does not support an inference of retaliatory motive by Spriggs based on communicating students' complaints.

Similarly, Edmonds contends that unidentified persons at a school district meeting may have influenced Spriggs to terminate her employment.  An employer may be liable for an adverse employment action "if one of its agents – other than the ultimate decisionmaker – is motivated by retaliatory animus and intentionally and proximately causes the action."  *Rooney*, 878 F.3d at 1118.  A plaintiff must produce sufficient evidence that this person "initiated, exercised, or even possessed any influence or leverage over the ultimate decisionmaker."  *Liles*, 851 F.3d at 820 (internal quotation marks omitted).

In her post-hearing declaration Edmonds asserts that "Martha Spriggs had no complaints of my performance until October after her attending a district meeting with other leaders from the school District which I believe could have influence[d] her decision."  Edmonds Decl. ¶ 9, Docket No. 40.  However, Edmonds offers no specific facts and no admissible evidence to support her allegation.  She does not give any date for the alleged district meeting; does not identify who attended or whether anyone other than Spriggs knew Edmonds or knew about her; does not describe what was said at the meeting, or by whom; does not explain how or why any attendee would have retaliatory

---

[3]  Edmonds testified that "Charleine [Williams] and Martha Spriggs, teachers and staff" told her that she met performance expectations.  Edmonds Dep. Tr. 266, Aba-Onu Decl. Ex. 1, Docket No. 35-1.  However, Spriggs' declaration and documents state otherwise, and Edmonds has not submitted any declarations by Williams or any teachers or other staff.

animus towards her; and does not explain what influence or leverage any attendee had over Spriggs or how such person would have exercised that influence so as to cause Spriggs to terminate Edmonds' employment.

Moreover, the timing does not support Edmonds' allegation. The record shows that Spriggs had decided to terminate Edmonds' employment no later than October 1, because October 1 is the date of her email to Employee Relations stating her termination decision and her reasons, and October 2 is the date of the termination letter that was hand delivered to Edmonds. Spriggs Decl. Ex. 1, Docket No. 34-1; Aba-Onu Decl. Ex. 6, Docket No. 35-1. Any "district meeting" in "October" that took place after October 1 could not have influenced Spriggs' decision because she communicated her decision to Employee Relations staff on October 1.

Edmonds also testified that, "as an African-American parent, not as the behavior dean," she told Spriggs that she thought a teacher "discriminated against" her child. Edmonds Dep. Tr. 268, Aba-Onu Decl. Ex. 1, Docket No. 35-1. The implication is that the discrimination was based on race, but the deposition transcript pages submitted to the Court contain no additional details of the incident. *See* Aba-Onu Decl. Ex. 1 and Supp. Decl. Ex. 7 (attaching deposition excerpts), Docket Nos. 35-1 and 42-1. Edmonds' post-hearing declaration describes the incident but does not mention any discrimination based on race. Edmonds stated that she informed Spriggs during the week of September 28, 2015 about an "incident that involved my [child]." Edmonds Decl. ¶ 10, Docket No. 40. She alleges that a teacher told her child that "[the child] would not be getting special treatment because I [Edmonds] work at the school," that her child's "feeling was hurt and [the child] felt very uncomfortable by her choice of

21

words.   Martha Spriggs let me know that my concern was noted." *Id.*   The record contains no statement from the teacher or anyone else with personal knowledge of the incident.   On its face, Edmonds' description of the incident she reported to Spriggs relates to treatment based not on race but instead on the student having a parent who is a school employee.   In addition, the comment that "Spriggs let me know that my concern was noted" does not support an inference of retaliatory motive.

Edmonds points to the timing of her termination as evidence of pretext.   She alleges that during the last couple of weeks of her employment she discussed with Spriggs some students' complaints about being unfairly treated based on their race, and that about a week before she was terminated she told Spriggs about the incident involving her child.   Edmonds Dep. Tr. 266, 276-77, Aba-Onu Supp. Decl. Ex. 7, Docket No. 42-1; Edmonds Decl. ¶ 10, Docket No. 40.   While temporal proximity standing alone is not evidence of pretext, it can be evidence to support an inference of retaliation if the other evidence is strong.   *See Green,* 459 F.3d at 916 ("[T]iming alone is insufficient to show a pretextual motive rebutting a legitimate, non-discriminatory reason for an adverse employment action.")   For example, in *Turner v. Gonzales*, 421 F.3d 688, 692 (8th Cir. 2005),  a long-time employee with a 20-year history of superior performance reviews reported allegedly discriminatory actions, and less than two months later her performance    rating    was    downgraded    from    Superior    to    Minimally Acceptable/Unacceptable.   The court held that this evidence supported an inference that her employer's stated reason was pretextual.   *Id.* at 698.

There are no similar facts here.   Edmonds was terminated during her probationary period, which by definition is of relatively short duration.   Given that her

entire employment lasted only about seven weeks, the temporal proximity factor does not weigh heavily in her favor, given the absence of other specific facts to support an inference of retaliatory motive.

Edmonds has not provided evidence from which a reasonable jury could conclude that Spriggs' specific performance reasons given for her termination were a pretext for reprisal.  As discussed above regarding Edmonds' race discrimination claim, to defeat MPS's summary judgment motion, Edmonds must do more than dispute Spriggs' conclusion that Edmonds' job performance was unsatisfactory or present some evidence that one or more of Spriggs' reasons may have been wrong.  *See Benassi*, 629 N.W.2d at 482 ("The proper scope of inquiry on the issue of pretext is limited to whether the employer gave an honest explanation of its behavior.").  Rather, Edmonds bears the legal burden to present sufficient evidence for a jury to conclude that Spriggs likely was motivated by retaliation when terminating her employment.  She has not done so, and summary judgment is appropriate.

## RECOMMENDATION AND ORDER

### RECOMMENDATION

For the reasons set forth above, IT IS RECOMMENDED THAT Defendant's Motion for Summary Judgment [Docket No. 31] be GRANTED.

### ORDER

For the reasons set forth above, IT IS HEREBY ORDERED THAT the Declaration [Docket No. 40] and documents/exhibits [Docket No. 40-1] filed by Billie Edmonds shall remain sealed.

Dated: February 14, 2018

*s/ David T. Schultz*
DAVID T. SCHULTZ
United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).